**Opinion filed October 31, 2012**



In The

# Eleventh Court of Appeals

_____

### No. 11-10-00279-CR
_____

### CHESTER MARION BELL, IV Appellant

### V.

### STATE OF TEXAS, Appellee

**On Appeal from the 29th District Court**

**Palo Pinto County, Texas**

**Trial Court Cause No. 14054**

### M E M O R A N D U M   O P I N I O N

The jury convicted Chester Marion Bell, IV of capital murder of a child under six years of age. *See* former TEX. PENAL CODE § 19.03(a)(8) (1993).[1]  The State waived the death penalty, and the trial court assessed an automatic punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for life without the possibility of parole pursuant to TEX. PENAL CODE ANN. § 12.31(a)(2) (West 2011).  We affirm.

---

[1]Section 19.03(a)(8) now provides that a person commits capital murder if the person murders an individual under ten years of age.  TEX. PENAL CODE ANN. § 19.03(a)(8) (West Supp. 2012).

Bell presents five issues for our review. In his first issue, Bell argues that he was denied his federal and state constitutional right to counsel and that the trial court abused its discretion when it failed to appoint death penalty certified counsel under TEX. CODE CRIM. PROC. ANN. art. 26.052 (West Supp. 2012). In his second issue, Bell asserts that the trial court erred when it failed to exclude extraneous offense evidence of sexual abuse of the victim when the State did not provide notice of its intent to offer evidence of sexual abuse as required under TEX. R. EVID. 404(b). Within this issue, Bell also argues that the trial court erred when it admitted photographs of the victim's anal injuries over Bell's objection under TEX. R. EVID. 403. Bell argues in his third issue that the State committed prosecutorial misconduct when it suggested that Bell sexually abused the victim. In his fourth issue, Bell contends that the trial court erred when it included an extraneous offense instruction in the jury charge. And in his fifth issue, Bell asserts that the evidence was legally insufficient to sustain a conviction for capital murder.

We will first address Bell's fifth issue in which he contends that the evidence was legally insufficient to sustain a conviction for capital murder. We review the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

The testimony at trial showed that Bell lived in a bunkhouse on his father's ranch with his girlfriend, Lauren, and her two-year-old son, B.O.M. On March 11, 2009, Lauren woke up early feeling congested and took some medicine. Bell left for work around 8:00 a.m. Lauren went back to sleep, and she and B.O.M. slept until 10:00 a.m. When they woke up, they snuggled in the recliner, ate cookies, and watched a movie. Lauren testified that B.O.M. was acting normally: "He was happy. He was interactive. He scolded me several times for taking a cookie without asking him first. He was -- he was Bubby."

Bell came home from work early, and Lauren asked him to watch B.O.M. and help him eat his lunch while she showered. Bell came into the bathroom twice while Lauren was in the shower to tell her that B.O.M. was not swallowing and that he was storing food in his cheeks

again. Lauren told Bell to just keep reminding B.O.M. to swallow. Bell came back into the bathroom a third time and told Lauren that he and B.O.M. were just going to go outside and play instead. Lauren got B.O.M. ready by putting on his jeans, vest, jacket, boots, and toboggan. B.O.M. gave her a kiss and a hug, grabbed Bell's hand, and left. Lauren testified that, when B.O.M. left with Bell, he was still acting normally, he was happy to go outside, and he was walking and talking.

While Bell and B.O.M. were outside, Lauren continued getting ready. When interviewed by police at the hospital, Lauren stated that she believed Bell and B.O.M. were outside for approximately ten minutes. At trial, she testified that she was extremely unfocused and stressed when she gave her statement to police and that she believed they were outside for approximately thirty to forty-five minutes. As she was getting ready, she heard yelling and started toward the door to see what was going on. Bell rushed into the house holding B.O.M. in his arms and yelling that B.O.M. was choking and that he did not know what to do. B.O.M.'s head was slightly back, his mouth was slightly open, his lips were a "purplish" color, and his body was "grayish blue." Lauren noticed a bloody, grotesque wound under B.O.M.'s chin. She testified that, before B.O.M. left the house, the wound was a small reddish scrape.

Lauren grabbed B.O.M. from Bell and did the baby Heimlich maneuver with no result. She yelled at Bell to call 911, but he did not want to call and instead wanted her to call. Lauren did not hear any sound from B.O.M.—no gurgling, no choking sound, nothing. He was completely unresponsive and limp and was not breathing. Lauren next tried the adult Heimlich, but again there was no response. She checked B.O.M.'s airway again, and he vomited. Lauren cleared his mouth and began CPR. During this time, she was still yelling at Bell to call 911. He was on the phone with someone else, but finally called. While he was on the phone with 911, he clicked over to answer another call; he eventually called 911 back. Lauren continued to do CPR until the response team arrived. She testified that she kept "thinking this isn't choking. This isn't like choking. I know choking. This isn't like choking." When the EMTs arrived, she got out of their way and tried to stay calm.

Linda Calvin, a dispatcher for the Palo Pinto County Sheriff's Department, received the 911 call from Bell at 1:28 p.m. Bell requested emergency medical attention for a two-year-old child that was choking and not breathing. Calvin sent an ambulance to the ranch. Calvin testified that Bell was excited and upset and did not want the child to die. During the 911 call,

3

Bell received another call and told her that he had to take that call. He hung up and called 911 back to reestablish the call.

Robin Allen, the Mineral Wells Fire Chief, responded to the 911 call. Chief Allen oversees EMS in Mineral Wells and is a paramedic. When she arrived at the bunkhouse, Lauren was doing what appeared to be CPR on B.O.M. Chief Allen saw vomit on the carpet beside B.O.M.'s head and testified that it is normal for a person to vomit when receiving CPR.

Bell was screaming and yelling and was very upset. Chief Allen testified that Bell's behavior was not uncommon and that she had seen it before when responding to emergency calls. Bell and Lauren were also arguing about whether B.O.M. had been given the wrong dose of children's Delsym, a cold medicine, or had been given a dose of adult Delsym. Chief Allen testified that giving him the wrong dose under either scenario was not consistent with the child's condition. She asked Bell about B.O.M.'s condition prior to choking, and Bell reported that B.O.M. was fine.

She picked B.O.M. up and took him to the ambulance. B.O.M. was not breathing, he did not have a pulse, and he was unconscious. In addition, he was pale, cool to the touch, and wet from the rain. His lips were cyanotic, and his eyes were open with no lash reflex. The palms of his hands were very dirty—like they had been stuck down in the mud. He had an abrasion under his chin that was oozing; neither Lauren nor Bell knew how B.O.M. received the injury. He also had a bruise in his hairline on his forehead and bruising on the left-hand side of his abdomen above his diaper line.

Chief Allen started CPR and assessed B.O.M.'s condition as very poor; he was in very bad shape. She saw some kernels of corn in his airway and removed the corn before intubating. Chief Allen testified that the corn was not obstructing B.O.M.'s airway but that she was afraid she would force a kernel through his airway if she did not remove the kernels before intubation. She did not know whether the food got in his airway from choking or from vomiting due to CPR. She was able to successfully intubate and begin breathing for B.O.M.

Steven Pinska, a Mineral Wells firefighter and EMT also responded to the 911 call. Pinska testified that Bell's demeanor was frantic and that Bell was yelling at them to hurry up and do something. Pinska had also observed that type of behavior in responding to an emergency call, but did not agree that it was normal. In Pinska's opinion, Bell was not helping and seemed agitated or hostile: "He almost became a threat, just the way he was acting and

4

shouting and screaming." Pinska agreed on cross-examination that he did not describe Bell's demeanor as threatening in his statement after the incident. When he asked Bell how B.O.M. received the abrasion under his chin, Bell said that it might be from a carpet burn. Lauren told Pinska that the abrasion was not on B.O.M.'s chin when B.O.M. left for the barn. Pinska described Lauren's behavior as being very out of it, like she was not grasping the situation.

When Chief Allen handed B.O.M. to Pinska, B.O.M. looked lifeless and unconscious. Pinska described B.O.M.'s skin as cyanotic, meaning that his skin was pale and his lips were blue. On the way to the hospital, Chief Allen gave B.O.M. epinephrine to help start a heartbeat. His heart began beating on its own within a couple of minutes. They arrived at the hospital at 2:03 p.m.

Misty Jones, an emergency room nurse at Palo Pinto General Hospital in Mineral Wells, along with Dr. Michael Bailey, an emergency room physician, received B.O.M. from EMS. Upon B.O.M.'s arrival at the hospital, Jones placed B.O.M. on a monitor, stabilized his condition, and ordered blood work. When another nurse took B.O.M.'s rectal temperature, the nurse noticed a tear to B.O.M.'s rectum. Lauren and Bell were in the room at the time, and Jones asked them both to leave. Jones called Dr. Bailey in to evaluate. Jones testified that B.O.M.'s rectum was dilated with a skin tear and that the injury was due to trauma, not constipation. While waiting on Dr. Bailey, Jones began looking for any other abrasions on B.O.M.'s body and found an abrasion under his chin and on his forehead. She also found old bruising across his abdomen. A CT scan of B.O.M.'s head was taken, and it showed that B.O.M. had suffered an injury to his head. Jones testified that the injuries to B.O.M.'s rectum and head were not consistent with choking. She also testified that Dr. Bailey indicated that his clinical impression of the rectal trauma was possible assault. Hospital personnel notified the sheriff's department.

When Dr. Bailey and Jones met EMS at the emergency room door, B.O.M. was intubated and nonresponsive. Dr. Bailey testified that B.O.M. had no pupilary response, meaning he had no brain wave activity. He also had a retinal hemorrhage, which indicated that he had an intracranial bleed. Dr. Bailey observed a bruise on B.O.M.'s chin, a bruise on his abdomen, and the rectal tear pointed out by Jones. There was absolutely no movement by B.O.M. and no spontaneous breathing.

When Dr. Bailey reviewed the CT scan of B.O.M.'s head, he saw blood in B.O.M.'s brain. He testified that the pressure of the blood was causing the brain to shift from left to right.

5

Eventually, the pressure would push the brain down toward the spinal cord. Dr. Bailey diagnosed the bleed as an intraparenchymal bleed or a subarachnoid hemorrhage from veins or arteries, and he classified the brain bleed as some type of abuse. He testified that the brain injury was not consistent with choking but that it was consistent with blunt force trauma to the head. Dr. Bailey did not believe that there was any way to know for sure what object might have been used to cause the trauma to B.O.M.'s head, but he said that, because there were no lacerations to B.O.M.'s head, certain objects could be ruled out as the cause. He did not believe that B.O.M.'s injuries were consistent with being kicked by a horse because normally a horse kick causes lacerations. In addition, B.O.M. sustained other injuries, and horses do not keep kicking; they kick once and move along. In Dr. Bailey's opinion, B.O.M.'s head could have been struck against something, possibly multiple times, or he could have been struck with something, including an adult's hands. Based on the history that B.O.M. had been running to the barn with Bell, Dr. Bailey believed that the bleed in B.O.M.'s brain occurred rapidly from the time of impact and that B.O.M. became symptomatic very quickly.

On cross-examination, Dr. Bailey testified that B.O.M. could have sustained the head injury from a short fall and that he could not rule out the possibility that the injury was inflicted by only one hit to the head. Dr. Bailey acknowledged on redirect that he had not reviewed the medical records from Cook Children's Hospital or the autopsy report. He clarified that he was not giving an opinion as to whether this was an injury caused by one blow to the head or multiple blows to the head. Based on everything he had seen, Dr. Bailey's opinion was that B.O.M.'s head injury was caused by abusive trauma, not by a short fall.

B.O.M. was at Palo Pinto General Hospital for approximately two hours. His condition deteriorated after approximately one hour. The Teddy Bear Transport team transported B.O.M. to Cook Children's Hospital in Fort Worth at 4:25 p.m.

Rebecca Sullivan, a forensic nurse on the Child Advocacy Resource and Evaluation Team at Cook Children's Hospital examined B.O.M. when he arrived. Sullivan documented the injuries to his skin, as well as the injuries to his anogenital area, collected DNA evidence, and tested for sexually transmitted infections. She testified that she documented the following injuries to B.O.M.'s skin: an abrasion to the top of his head, a purple bruise on his forehead, a yellow bruise in the middle of his forehead, a reddish bruise above his lip, an abrasion on his nose, a deep abrasion under his chin, a red mark under his collarbone, a red bruise in the middle

6

of his chest, another red mark on his chest, a red bruise on his abdomen, yellow-purplish bruises on his abdomen, a red bruise on his right arm, very small red areas of bruising on his right thigh, a yellow-red bruise on his left knee, a yellow-red bruise on his back, a green area of bruising on his back, yellow bruising on his back, a yellow-purple bruise on his left buttock, a red bruise on his right buttock, an abrasion on his right buttock, a reddish-yellow injury on his right leg, and a red-purple bruise on his upper left leg. Sullivan conducted an anogenital exam because it had been reported that there was blood in B.O.M.'s diaper; thus, there was concern for sexual abuse. She documented the following injuries during her exam: multiple fissures (tearing along the skin folds that surround the anus), two tears to his anus, a tear past his anus into his rectal tissue, and a possible bite mark near his penis. She also noted that his anus was relaxed and that there was bright red blood inside his anus. Sullivan testified that the two tears to his anus and the tear past his anus were injuries that indicated penetration and, therefore, sexual abuse. The fissures could be consistent with constipation, and she had seen fissures in children who were not abused. Sullivan diagnosed B.O.M. as having suffered both physical and sexual abuse. She testified that her diagnosis was inconsistent with the history given because Lauren was not aware of any sexual abuse and many of Sullivan's findings were specific for sexual abuse.

During cross-examination, Sullivan testified that a person would be able to see the tears to B.O.M.'s anus when changing his diaper but that it would be possible to miss the tears. She also testified that, because the bruises to B.O.M.'s body were in multiple stages of healing, Lauren would have seen the bruises when changing B.O.M.'s clothes. In her opinion, the tears appeared to be recent because there was no indication of healing and because fissures can heal within hours. Sullivan clarified that there were no teeth marks on the semicircular area near B.O.M.'s penis that she believed was a possible bite mark.

Dr. Linda Thompson, a physician in the Pediatric Intensive Care Unit (PICU) at Cook Children's Hospital, testified that, when B.O.M. was admitted to PICU he was critically ill, he was supported by a ventilator, his pupils were nonreactive, and he was nonresponsive to pain. B.O.M. had suffered a severe brain injury, specifically a subdural hemorrhage. Because of the severe swelling throughout his brain, surgery was not an option. His brain had started to cut off its own blood supply and had started to push itself down toward the spinal cord. Dr. Thompson could tell that there was fresh blood between the two areas of the brain, which indicated that the brain injury was recent. In her opinion, the injury occurred during the time that B.O.M. was out

of the house with Bell. She testified that, if he had suffered the injury before he left the house, he would not have been behaving normally as Lauren had reported. The degree of brain injury that B.O.M. suffered would have immediately rendered him unconscious. Even without a severe brain injury, B.O.M. would not have been walking and acting normally with the degree of trauma to the rest of his body.

Dr. Thompson also testified that B.O.M. had a retinal hemorrhage and opined that the retinal hemorrhage was consistent with a severe shaking injury. She did not know whether his injuries were caused only by severe shaking or by both shaking and impact, but believed that there was a shaking component. When asked whether the injuries B.O.M. suffered were accidental or inflicted, she responded, "That was certainly an inflicted injury." The anal injuries were also inflicted injuries in her opinion and were caused by penetration. B.O.M.'s death was the most violent death she had ever seen of a child in her practice.

On cross-examination, Dr. Thompson testified that B.O.M.'s head injury was consistent with shaken baby syndrome and inconsistent with one strike to the head. B.O.M. could have been struck by something soft, but not by an object such as a bat. On redirect, Dr. Thompson acknowledged that she had not reviewed the autopsy photographs or report and that, if the autopsy showed four points of impact, then her opinion would be that the injury was more likely to have been caused by shaking with impact. She did not have an opinion as to whether B.O.M.'s head was struck with an object or against an object, but she opined that the injury would have been caused by one or the other.

B.O.M. was declared legally brain dead on March 12.

Dr. Gary L. Sisler, the Deputy Medical Examiner for Tarrant, Parker, Denton, and Johnson Counties, performed the autopsy. During his external autopsy examination, Dr. Sisler noted the following injuries on B.O.M.: a healing purple contusion on his right forehead, another healing contusion on his right forehead, a contusion on his left temporal scalp, a healing contusion on his right temporal scalp, an abrasion on his posterior head, a healing contusion on the back of his head, an abrasion on his interior chin, a nodule on the back of his head, a healing contusion on his left buttock, three healing contusions on the right side of his back, a semicircular contusion above his genital area, superficial lacerations of his anal area, a healing contusion on his lower abdomen, a brown healing contusion on his left thigh, a healing contusion on his right elbow, and a healing contusion on his right forearm. Dr. Sisler's internal autopsy

8

examination revealed two subcutaneous contusions to B.O.M.'s skin on the right side of his back and a small area of hemorrhaging on the left side of B.O.M.'s abdomen. He did not find any foreign object inside B.O.M.'s body that could have caused B.O.M. to choke.

As to B.O.M.'s internal head injuries, Dr. Sisler found four subgaleal hemorrhages or bruises underneath B.O.M.'s scalp: one in his occipital scalp (back of his head), one on the right side of his scalp, another one in front, and one in the left parietal scalp. Dr. Sisler testified that each hemorrhage indicated a point of impact. Dr. Sisler's external examination of B.O.M.'s brain revealed subdural hematomas on both the left and right side of his brain and a patchy subarachnoid hemorrhage. He explained that a hematoma was a collection of blood and that, for B.O.M.'s size, the brain contained a considerable amount of blood. Dr. Sisler further explained that the collection of blood acted like a mask and caused the displacement of B.O.M.'s brain by compressing the brain and forcing the brain to move. Because his brain could not move very much inside his skull, the collection of blood forced the lower portion of his brain down through a hole in the base of his skull toward his spinal cord. When the lower portion of his brain was forced down through that opening, his body's breathing center was compressed. This eventually led to his death. Dr. Sisler also found hemorrhages in the back of B.O.M.'s eyes and hemorrhages along his optic nerves; both injuries indicated trauma to the head.

Dr. Sisler testified that there was no way to know exactly what object impacted B.O.M. but that B.O.M.'s injuries showed he suffered four separate impacts to his head from a hard object. B.O.M. could have been hit with a hard object or struck against a hard object. His injuries were also consistent with being hit by someone's hand. His injuries were not consistent with choking. Nor were his injuries consistent with being kicked by a horse. He explained that a child can receive this type of injury to his or her brain and not suffer a skull fracture because a child's bones are very flexible due to the fact that the bones have not ossified or calcified at that stage in life. In his opinion, B.O.M.'s injuries were not consistent with shaken baby syndrome, and he testified that he had never done an autopsy where his conclusion was shaken baby syndrome. Dr. Sisler also testified that a person would generally lose consciousness immediately after suffering these types of injuries but that he was aware of cases where a person stayed conscious for two to three hours after suffering these types of injuries.

Dr. Sisler's autopsy findings were acute left- and right-side subdural hematomas and a left subarachnoid hemorrhage. His diagnosis was a severe brain injury with progression to death.

He sent B.O.M.'s brain to Dr. Michael S. Handler, a forensic neuropathologist. Dr. Handler concurred with Dr. Sisler's findings: the cause of death was a traumatic head injury and the manner of death was homicide.

Dr. Randell Curtis Alexander testified as an expert witness on behalf of the State. Dr. Alexander was the only doctor who reviewed all the medical records, including the autopsy report and photographs. Based upon his review, it was his opinion that B.O.M. was physically abused. As to the injuries in B.O.M.'s anal area, Dr. Alexander was not sure whether there was sexual intent but, because in his opinion the injuries were caused by penetration, there was at least physical abuse to a sexualized area. Based on his review of the record and the healing process, it was his opinion that the two anal lacerations were fresh and only hours old, but "certainly no more than 24 hours old."

Dr. Alexander agreed with Dr. Sisler's conclusion that the cause of death was a traumatic head injury and that the manner of death was homicide. Dr. Alexander explained that, in order for B.O.M. to have bruising under the scalp like he did, there had to have been four pretty significant and serious impacts to his head. Little bumps to his head would not have caused his injuries, nor would a fall have caused his injuries. He agreed that the retinal hemorrhages showed that there was a very violent shaking component to B.O.M.'s injuries, but did not agree that B.O.M.'s injuries were caused only by shaking. Dr. Alexander testified that it was common to have some component of shaking along with impact that leads to the death of a child. In his opinion, the four impact points on B.O.M.'s head could have been caused by Bell striking B.O.M. with his hands, by Bell striking B.O.M. with an object that was hard and flat, or by Bell striking B.O.M. against an object that was hard and flat. The object could have been a wall, a floor, the ground, a flat part of a fence, or any other object that was hard, flat, and smooth. If the impacts to B.O.M.'s head were caused by Bell's hand, the impact would not have necessarily caused a bruise to Bell's hand. Because the injuries were fatal brain injuries, it would have been impossible for B.O.M. to have sustained the injuries and still be able to walk and talk and appear to be "fine." B.O.M. would have lost consciousness immediately; he would have gone down instantly. Dr. Alexander found nothing in his review of the case that was consistent with choking as Bell reported. Dr. Alexander concluded that B.O.M. sustained the brain injuries between the time when B.O.M. walked out of the bunkhouse with Bell and the time that Bell brought him back clinically dead.

Sergeant Chad Jordan of the Palo Pinto County Sheriff's Office took Bell's statement at the Palo Pinto General Hospital on March 11. Bell told the police that he and B.O.M. were in the house eating lunch around 1:00 p.m., that B.O.M. did not appear to want to eat, and that they went on a walk to the barn. On the way to the barn, B.O.M. fell, and Bell asked him if he was okay. B.O.M. still had food in his mouth, and Bell told him to spit it out. They walked to the "round pen" together, and Bell told B.O.M. to get a stick so that he could get the teeth out of a pig skull. As Bell turned to work on the pig skull, he heard B.O.M. gag. He ran over to B.O.M., picked him up, and started slapping him on his back to try to get him to spit out whatever was in his mouth. He also "swept" B.O.M.'s mouth with his finger, but B.O.M. was still choking and not breathing. Bell tried slapping him on his back again and tried the Heimlich, but nothing was working. He ran to the house with B.O.M. By this time, B.O.M. had gone limp. Bell stated that B.O.M. called him daddy.

Captain Craig Goen of the Palo Pinto County Sheriff's Department testified that, based on his training and experience, he did not believe Bell's story matched B.O.M.'s injuries. When he talked to Lauren, he learned that B.O.M.'s toboggan and boots were missing. Captain Goen and Sergeant Jordan went to the ranch the next day and found the boots and toboggan in the round pen. He testified that this was significant because B.O.M. was wearing the boots and toboggan when he left with Bell but was not wearing either when he returned. The boots and toboggan were sent to a lab, but based on his training and experience, he did not believe that any trace or forensic evidence would be discovered due to the fact that it had rained heavily overnight at the ranch.

Captain Goen also testified that he presented the case to the grand jury but that he was not able to present a murder weapon to the grand jury because he was not able to identify the object used to inflict B.O.M.'s head injuries after searching the premises where the events allegedly occurred. Based on his training and experience as a criminal investigator, he did not know of any other means that he could reasonably use to locate the object, especially when he was not able to ascertain what specific object to look for. The grand jury did not request or instruct Captain Goen to take any further steps to try to locate the object.

Three people testified in Bell's defense: Jim Cominsky, Amy Leanne Moss, and Chester Marion (Trey) Bell, III. Cominsky testified that he was the friend who was on the phone with Bell during the 911 call. Bell sounded terrified and told Cominsky that B.O.M. was choking and

that he was trying to help him. Cominsky told Bell to get back on the phone with 911, and Cominsky went straight to the hospital. About a week before the incident, Lauren, Bell, and B.O.M. had been at his house, and B.O.M. bumped his upper forehead on Cominsky's coffee table. Moss testified that, two weeks before the incident, Lauren, Bell, and B.O.M. came to her house and were concerned about an abrasion on the top of B.O.M.'s head. She told them that they should have it checked, but she did not think that B.O.M. needed stitches. Moss babysat B.O.M. the day before the incident and saw a spot underneath his chin that was about the size of a quarter or a half-dollar coin. She also saw a bruise on his head at his hairline. On cross-examination, Moss testified that B.O.M. was conscious, breathing, and walking under his own power and that there was no reason to seek medical attention. Trey Bell, Bell's father, testified that he also babysat B.O.M. on the day before the incident. He noticed a bruise on B.O.M.'s hairline, a raw mark under his chin, and an old cut on the top of his head. B.O.M. was conscious and breathing and was not in such a physical condition that required medical care. B.O.M. acted fine when Lauren picked him up from Trey's house.

Bell argues that the evidence is legally insufficient to sustain his conviction for capital murder of a child under six years of age because the doctors' opinions varied as to how B.O.M. sustained his fatal head injuries. Bell was convicted as charged in the indictment for knowingly causing the death of B.O.M., an individual younger than six years of age, by striking B.O.M. with his hand or hands, by striking B.O.M. with an unknown object, or by striking B.O.M. against an unknown object. As we have noted, Captain Goen testified that he presented the case to the grand jury without presenting a murder weapon. Based on his training and experience, he did not believe that there were any other steps that he could have taken to find the murder weapon, nor did the grand jury request that he take any other steps to find the weapon.

Dr. Bailey testified that, in his opinion, B.O.M. could have been struck against something, possibly multiple times, or he could have been struck with something, including an adult's hands. Dr. Thompson testified that, in her opinion, the injury occurred during the time that B.O.M. was out of the house with Bell. She believed that there was a shaking component to his injuries, but she did not know whether his injuries were caused only by severe shaking or by both shaking and impact. Dr. Thompson did not have an opinion as to whether B.O.M.'s head was struck with an object or against an object, but he opined that the injury would have been caused by one or the other. She believed that the object would have been something soft. Both

Dr. Bailey and Dr. Thompson acknowledged that they had not reviewed all of the medical records, nor had they reviewed the autopsy photographs and report.

Dr. Sisler diagnosed B.O.M. with a severe brain injury with progression to death. He determined that the cause of death was a traumatic head injury and that the manner of death was homicide. Dr. Sisler could not tell the jury exactly what object impacted B.O.M., but he testified that B.O.M.'s injuries showed that he suffered four separate impacts to his head from a hard object. In his opinion, B.O.M. could have been hit with a hard object or struck against a hard object. His injuries were also consistent with being hit by someone's hand. B.O.M.'s injuries were not consistent with choking, with being kicked by a horse, or with shaken baby syndrome. Dr. Alexander testified that B.O.M. sustained the fatal injuries when he was outside with Bell and that the four points of impact on B.O.M.'s head could have been caused by Bell striking B.O.M. with his hands; by Bell striking B.O.M. with a hard, flat object; or by Bell striking B.O.M. against a hard, flat object. Because of the retinal hemorrhages, he also believed that there was a very violent shaking component to B.O.M.'s injuries.

Bell's complaint attacks the credibility and consistency of the doctors' testimony. However, the jury, as the trier of fact, was the sole judge of the credibility of the witnesses and of the weight to be given their testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979). As such, the jury was entitled to accept or reject any or all of the testimony of any witness. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). In addition, it was within the jury's province to resolve any inconsistencies or conflicts between the doctors' testimony. *Washington v. State*, 442 S.W.2d 395, 396 (Tex. Crim. App. 1969). Furthermore, the jury was entitled to draw reasonable inferences from the evidence. *Jackson*, 443 U.S. at 319. We have reviewed the evidence in the light most favorable to the verdict, and we hold that a rational trier of fact could have found beyond a reasonable doubt that Bell committed capital murder of B.O.M. by striking B.O.M. with his hand or hands, by striking B.O.M. with an unknown object, or by striking B.O.M. against an unknown object. We overrule Bell's fifth issue.

We will next address Bell's argument that the trial court erred when it admitted evidence that B.O.M. was sexually abused. In his second issue, Bell asserts that the trial court erred when it failed to exclude extraneous offense evidence of sexual abuse of the victim when the State did not provide notice of its intent to offer evidence of sexual abuse as required under TEX. R.

13

EVID. 404(b). Bell is correct in his assertion that the State's notice of its intent to introduce evidence under Rule 404(b) did not give notice that the State intended to introduce evidence that Bell sexually assaulted B.O.M. However, the State argues that Bell waived any complaint regarding admission of the evidence of B.O.M.'s anal injuries when he failed to make timely and consistent objections to the evidence. In the alternative, the State contends that the evidence of sexual abuse was "same transaction contextual evidence" because it was merely evidence of the injuries that B.O.M. sustained on the date of the offense.

Bell's appellate counsel conceded at oral argument that Bell waived his complaint on appeal regarding the State's failure to provide notice of the extraneous offense of sexual abuse if his defense counsel reviewed the medical photographs and reports prior to trial. The record indicates that the medical records from Palo Pinto General Hospital had been on file with the trial court for almost three months prior to trial and that the medical records from Cook Children's Hospital had been on file for over two weeks prior to trial. In addition, the State represented to the trial court that it notified Bell that it filed the records with the trial court on the same day it filed them. Defense counsel represented that he had reviewed the Palo Pinto General Hospital records and did not object to the admission of either set of medical records. Furthermore, defense counsel never objected to any testimony or photographs concerning B.O.M.'s anal injuries on the basis of Rule 404(b) notice. The only objection defense counsel made to any evidence of sexual abuse was a Rule 403 objection to four photographs depicting B.O.M.'s anal and groin injuries when he was admitted to Palo Pinto General Hospital. We will address the admission of these photographs separately. Even if the evidence of sexual abuse constitutes extraneous offense evidence, Bell waived any Rule 404(b) notice complaint when he failed to object at trial. We also find that Bell waived his notice complaint based on his appellate counsel's concession at oral argument: the record shows that Bell's defense counsel reviewed at least one set of medical records prior to trial.

State's Exhibit Nos. 37 and 38 are photographs of what Sullivan believed to be a bite mark near B.O.M.'s penis. State's Exhibit Nos. 39 and 40 are photographs of B.O.M.'s anal injuries. Bell argues that the trial court abused its discretion when it admitted the photographs over Bell's objection under TEX. R. EVID. 403. Rule 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or

14

needless presentation of cumulative evidence." Bell contends that the photographs inflamed the jury and, like all of the evidence depicting or describing B.O.M.'s anal injuries, constituted inadmissible extraneous offense evidence. We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991). We will reverse a trial court's ruling only if it is outside the "zone of reasonable disagreement." *Id.*

State's Exhibit Nos. 37, 38, 39, and 40 were admitted through Sullivan. The State contends that Bell waived appellate review of this issue because he failed to object to Sullivan's testimony in which she described the anal and groin injuries. She testified about the injuries both prior to and after the admission of the photographs. The State also argues that Bell waived any error when he failed to object to other photographs and testimony concerning B.O.M.'s anal injuries. We agree. "[O]verruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling." *Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998).

Before the State offered the four photographs, Sullivan testified about the injuries that she documented to B.O.M.'s anogenital area; there was no objection. Defense counsel did not object when Sullivan opined that the two tears to B.O.M.'s anus and the tear past his anus into his rectal tissue indicated that he had been sexually abused. After Sullivan described the injuries she documented during the exam in detail, the State offered the four photographs that Sullivan took during her exam. Sullivan stated that it was difficult to appreciate the actual injuries when viewing them on a flat photograph. Defense counsel objected under Rule 403 without providing any factors for the trial court to weigh. The trial court overruled the objection without argument from either side. During defense counsel's cross-examination of Sullivan, defense counsel asked whether she used a sexual assault kit as part of her exam. He also emphasized that Lauren would notice the injuries when she changed B.O.M.'s diaper but that Lauren did not indicate a history of sexual abuse.

In addition, Bell did not object to State's Exhibit No. 63, a photograph taken by Dr. Sisler during the autopsy that documented B.O.M.'s anal injuries. Nor did Bell object to Dr. Sisler's testimony that he observed superficial lacerations on B.O.M.'s anal area and that the injuries had healed somewhat from when B.O.M. was first brought to the hospital. Moreover, defense

counsel questioned Dr. Sisler about whether it was true that, if Dr. Sisler had performed a sexual assault exam, he could have used DNA to possibly match a known perpetrator to the assault.

Defense counsel also did not object to Dr. Alexander's testimony regarding B.O.M.'s anal injuries. He testified that he was not sure whether there was sexual intent in causing the injuries to B.O.M.'s anal area but that, because the injuries were caused by penetration, there was at least physical abuse to a sexualized area. On cross-examination, Dr. Alexander testified that, based on his review of the record and the healing process, it was his opinion that the two anal lacerations were fresh and were no more than twenty-four hours old.

Furthermore, prior to Sullivan's testimony, defense counsel had asked Jones what Dr. Bailey's note in the medical records was in regard to his clinical impression of the rectal trauma. She replied, "Possible assault." Defense counsel never objected to Jones's testimony regarding the rectal tear. Additionally, defense counsel asked Dr. Bailey on cross-examination whether he observed the tear on B.O.M.'s rectum, to which Dr. Bailey responded he had.

Because other evidence of B.O.M.'s anal injuries was admitted without objection, Bell has waived his argument that the trial court erred in admitting State's Exhibit Nos. 37, 38, 39, and 40. We overrule Bell's second issue.

In his third issue, Bell argues that the State committed prosecutorial misconduct when it suggested that Bell sexually abused B.O.M. when the State knew that there were no affirmative links between B.O.M.'s sexual assault injuries and Bell. Dr. Alexander testified that, based on his review of the record and the healing process, it was his opinion that the two anal lacerations were fresh and only hours old, but "certainly no more than 24 hours old." He explained that the lacerations would be visible to the naked eye and that, if a person changed B.O.M.'s diaper and used a wipe, B.O.M. would have "yelp[ed]" when the wipe touched the raw laceration. Sullivan testified that the anal injuries appeared to be recent because fissures can heal within hours and because there was no indication that the fissures had begun to heal. While the evidence may support other theories of how B.O.M. sustained his anal injuries, the evidence also supports the State's theory that B.O.M. sustained his anal injuries when he was with Bell. We hold that the State did not commit prosecutorial misconduct when it introduced evidence of B.O.M.'s anal injuries or when it suggested during closing argument that B.O.M. received those injuries at the same time he suffered the blows to his head.

Bell also contends that the State engaged in improper jury argument when it suggested that Bell inflicted the anal injuries. There are four categories of proper jury argument: (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to the arguments of opposing counsel, and (4) pleas for law enforcement. *Cantu v. State*, 842 S.W.2d 667, 690 (Tex. Crim. App. 1992). The State's summary of B.O.M.'s anal injuries was a summation of the testimony given by multiple doctors and nurses regarding the various injuries that the doctors observed on B.O.M.'s anogenital area, and its suggestion that B.O.M. received the injuries at the hands of Bell was a reasonable deduction from the evidence presented at trial. We hold that the State did not engage in improper jury argument. Bell's third issue is overruled.

In his fourth issue, Bell maintains that the trial court erred when it included an extraneous offense instruction in the jury charge. The extraneous offense instruction provided in part as follows: "You are instructed that *if* there is any testimony before you in this case regarding the defendant's having committed other crimes, wrongs, or bad acts, other than the offense alleged against him in the indictment . . . , you" can only consider evidence of those extraneous offenses, "*if* any," under certain circumstances and only for certain purposes (emphasis added). The State contends that the trial court was not required in this case to instruct the jury on extraneous offenses because the sexual assault evidence was same transaction contextual evidence and that, even if the trial court erred, Bell did not suffer egregious harm. Bell did not raise any objections or request any additions or deletions to the charge. Because the jury was instructed to consider extraneous offenses only *if* there was any testimony regarding extraneous offenses committed by Bell, we cannot hold that the trial court erred in submitting the instruction. In addition, even if the trial court did err when it submitted the instruction, we do not see how Bell was harmed by such an instruction. If the jury believed that there was testimony regarding extraneous offenses, then the instruction benefited Bell because it limited the jury's consideration of those extraneous offenses. We overrule Bell's fourth issue.

In his first issue, Bell asserts that he was denied his constitutional right to counsel under the Fifth and Sixth Amendments to the United States Constitution and under Article I, sections 10 and 19 of the Texas constitution. Specifically, Bell argues that the trial court abused its discretion when it failed to appoint counsel within three days of his request as required by TEX. CODE CRIM. PROC. ANN. art. 1.051(c) (West Supp. 2012). In addition, Bell argues that the

trial court abused its discretion when it failed to appoint death penalty certified counsel as required by Article 26.052, until 105 days after arraignment.

Bell was arraigned on June 5, 2009. As of the date of the arraignment, the State had not waived the death penalty. At arraignment, Bell informed the trial court that he wanted a court-appointed attorney. The trial court advised Bell to talk with his family and friends to determine if he knew anyone who could help him hire his own attorney and, if not, to fill out a request for court-appointed counsel. Bell signed the request for court-appointed counsel on June 5. The request was filed with the trial court clerk on June 24, and the trial court appointed Kenneth N. Tarlton and Robert Watson to represent Bell on the same day, June 24. It is unclear from the record why there was a delay in filing the affidavit from the day on which Bell signed the affidavit, but the statute only requires the court to appoint counsel no "later than the end of the third working day after the date on which the court or the court's designee receives the defendant's request for appointment of counsel." Article 1.051(c). The record indicates that the court received the request and appointed counsel to represent Bell on June 24. Therefore, Bell's argument that he was not appointed counsel within three days of his request is without merit.

Tarlton and Watson filed a motion on August 5 to require the State to give notice of any intent to seek the death penalty. The trial court held a hearing on the motion on August 19. During the hearing, the State notified the trial court that it would be seeking the death penalty. In accordance with Article 26.052, the trial court appointed death penalty qualified counsel— Warren St. John and David Pearson—to represent Bell. St. John was appointed on September 15, and Pearson was appointed on September 18. The trial court released Tarlton and Watson from further representation on September 18.

The State contends that Bell failed to preserve any error relating to the appointment of death penalty counsel and that, even if Bell did preserve error, he has failed to show harm. We agree. In this case, Bell was represented by qualified death penalty counsel within a month of the date on which the State gave notice that it intended to seek the death penalty. Until Bell was appointed death penalty counsel, he was represented by appointed counsel in accordance with Article 1.051(c). Furthermore, the State ultimately waived the death penalty. Even if the trial court erred when it appointed nonqualified death penalty counsel in response to Bell's request for counsel, Bell was not harmed because the death penalty was not sought at trial and because Bell has not claimed that any of his appointed counsel were deficient in their representation. *See*

18

*Hughes v. State*, 24 S.W.3d 833, 837–38 (Tex. Crim. App. 2000) (finding Article 26.052 error harmless under TEX. R. APP. P. 44.2(b)).  Bell's first issue is overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT

CHIEF JUSTICE


October 31, 2012

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel[2] consists of: Wright, C.J.,
McCall, J., and Hill.[3]

---

[2]Eric Kalenak, Justice, resigned effective September 3, 2012.  The justice position is vacant pending appointment of a successor by the governor or until the next general election.

[3]John G. Hill, Former Chief Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.